[Cite as *Murtha v. Rossford Exempted Village Schools*, 2024-Ohio-1798.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

Patrick Murtha

      Appellee

v.

Rossford Exempted Village
Schools, et al.

      Appellants

Court of Appeals No.  WD-23-022

Trial Court No.  2021 CV 0140

**<u>DECISION AND JUDGMENT</u>**

Decided:  May 10, 2024

* * * * *

R. Ethan Davis, for appellee.

Bryon S. Choka, Lisa E. Pizza, Julia A. Bauer,
and Jessica K. Philemond, for appellants.

* * * * *

**ZMUDA, J.**

## I. Introduction

{¶ 1} Appellant, Dan Creps,[1] as well as Rossford Exempted Village Schools

(REVS) and the Rossford Board of Education (board) file this interlocutory appeal of the

---

[1] Rossford Exempted Village Schools and the Rossford Board of Education are appellant's co-defendants in the trial proceedings and joined appellant in his notice of appeal and merit brief.  However, because this interlocutory appeal is limited to whether appellant, as a political subdivision employee, is immune from liability under R.C. Ch. 2744, only appellant has standing.  *See Thompson v. Buckeye Joint Vocational School*

April 20, 2023 order of the Wood County Court of Common Pleas denying their motion for summary judgment in which they argued in part that as an employee of a political subdivision, appellant was entitled to immunity from the tort claims brought against him by appellee, Patrick Murtha. Because we find that the trial court erred in its order denying summary judgment to appellant on this issue, we reverse the trial court's order and remand for further proceedings.

## II. Background

{¶ 2} Appellee was formerly the REVS assistant high school principal and athletic director. The board hired appellee as assistant high school principal in April 2004, and appellee's employment ended on July 31, 2019 pursuant to an agreement between appellee and the board. The agreement was executed following an investigation of three students' complaints alleging that appellee had engaged in inappropriate conduct.

{¶ 3} On April 21, 2021, appellee filed a complaint in the Wood County Court of Common Pleas asserting several claims against appellant—the superintendent of REVS—as well as against REVS and the board (REVS and the board will be collectively referred to as Rossford) concerning the events surrounding his separation from employment. The claims included breach of contract, defamation, false light, intentional infliction of emotional distress, negligence, and violations of procedural due process, substantive due process, and appellee's liberty interests under the Ohio Constitution.

*Dist.*, 2016-Ohio-2804 (noting that the exceptions in R.C. 27044.03(A)(6) to political subdivision employee immunity apply to an employee sued in his individual capacity).

2.

{¶ 4} Appellant and Rossford moved for summary judgment on all of appellee's claims. Among other things, appellant argued that as an employee of a political subdivision, he was immune from liability for appellee's tort claims under R.C. Ch. 2744. The transcripts of the depositions of appellant, appellee, and a Rossford employee, Megan Spangler, were filed in support. The trial court denied appellant and Rossford's motion for summary judgment in part, holding that genuine issues of material fact remained on whether appellant was immune under R.C. Ch. 2744.[2] Appellant filed an interlocutory appeal pursuant to R.C. 2744.02(C) challenging the trial court's order solely on the basis of his immunity under R.C. Ch. 2744.

## A. Factual Background

{¶ 5} On February 7, 2019, three female Rossford high school students complained to the Rossford high school principal that appellee had inappropriately touched them on their hair, faces, or bodies and that he made inappropriate comments to them. The principal called appellant, then the superintendent of Rossford, to inform him that students had made complaints against appellee. Appellant put appellee on a paid administrative leave beginning February 8, verbally informing appellee that a complaint had been made against him. On February 11, 2019, appellant sent a letter to appellee stating that Rossford had received a complaint that appellee had engaged in misconduct with a student.

---

[2] The trial court granted appellant and Rossford's motion for summary judgment only as to appellee's claim for intentional infliction of emotional distress and denied the motion in all other respects.

3.

### 1. Spangler's Investigation

{¶ 6} Appellant instructed Megan Spangler, a Rossford anti-harassment compliance officer, to investigate the complaints. Spangler was advised by Rossford's legal counsel throughout the investigation. Spangler began conducting interviews on February 11, and over the next few weeks, she interviewed the complainants, several students and staff, and appellee in the presence of his attorney. Following her investigation, Spangler prepared a written report ("Spangler's report") addressed to appellant. In the copy of the report she provided to appellant, Spangler referred to the students by numbers rather than by their names. In addition, her report contained a caution that all personally identifiable information of students must be further redacted before the report could be disseminated, citing the Family Education Rights and Privacy Act (FERPA), 20 U.S.C. 1232g, 34 C.F.R. Part 99, and R.C. 3319.321.

{¶ 7} Spangler's report detailed the three complaints made by students whom she designated as Students 5, 11, and 12. All three complainants alleged that appellee had inappropriately touched them on their hair, faces, or arms, as well as made inappropriate comments about their appearances. Student 11 stated that appellee had touched her hair, ears, or nose over 40 times in the past year, and she had heard appellee make a derogatory comment about another student's body. Student 12 stated that appellee had played with or twirled her hair and massaged her shoulders more than once, and appellee had looked down her shirt and stared at her chest. Student 5 stated that appellee touched her hair and had grazed her buttocks with his hand, made inappropriate comments and

4.

jokes, and would stand too close to her. All three stated that they felt uncomfortable due to appellee's actions.

{¶ 8} In addition to the complainants, Spangler interviewed nine other students and several staff members, including interview subjects that appellee requested Spangler interview. Of the nine students interviewed by Spangler, many were in a different friend group than the complainants according to Spangler. Of the nine additional students, five reported that appellee had touched their hair or shoulders. Of these five, two of them said they did not feel uncomfortable due to the touching, four stated that appellee had stared at private areas of their body, and one stated that she kept a hoodie to wear when she worked near appellee's office. The remaining four students denied any inappropriate contact from appellee.

{¶ 9} Spangler also interviewed staff members. Spangler noted in her report that some staff members appeared hesitant to discuss appellee, with some staff members expressing concern that appellee would retaliate against them and others expressing a lack of interest in becoming involved in the investigation. Nonetheless, one front office staff member reported seeing appellee rubbing the shoulders of a female student who was not one of the complainants. A second staff member from the front office saw appellee approach a female student—again, not one of the complainants—from behind and pull the student's hair into a ponytail. None of the staff members Spangler interviewed had seen appellee touch any of the complainants.

5.

{¶ 10} During her investigation, Spangler asked students and staff members whether they knew of anyone who would want to get appellee in trouble, and she discovered that the complainants likely had a retaliatory motive in making the complaints. Spangler included approximately two paragraphs summarizing the potential motive in her investigation report. She testified about this portion of her report at her deposition as follows:

> Q. As reflected in your investigation report were you aware that the cheerleaders were unhappy with their new uniforms?
> A. I did learn that through the course of the investigation.
> Q. Okay. And that they had asked [appellee] if they could fund raise and obtain new replacement uniforms, correct?
> A. Correct.
> Q. And he said no?
> A. Correct.
>     …
> Q. Okay. And ultimately a meeting was scheduled with several cheerleaders, [appellee] and [Rossford High School] Principal Brashear for them to make a presentation as to why they felt they needed new uniforms, correct?
> A. Correct.
> Q. Okay. And they prepared a Power Point presentation, correct?
> A. Correct.
> Q. And you had a copy of that in your report?
> A. Yes.
> Q. Okay. And fair to say they didn't like the color of the uniforms and they weren't sparkly enough?
>     …
> A. The quality of the uniforms and, they said the color was off and the quality was poor.
> Q. And so after that presentation [appellee] again denied their request, correct?
> A. Yes.
> Q. And --
> A. I think [Principal] Brashear denied the request at that point.
>     …

6.

Q. And per your investigation report that presentation occurred during third period?

…

A. The slide show was presented to [Principal] Brashear and [appellee] during third period.

Q. And then what did your investigation reveal happened during fourth period?

A. There were a few of the girls who were cheerleaders, also one that was not a cheerleader who was discussing the event that happened with [appellee] in Athens and said that he shouldn't be working with students, they were going to get him fired.

Q. Okay.

A. As well as the cheerleading adviser.

Q. As well, so immediately following third period when they did their presentation and they were told no on the new uniforms they were observed by both teacher and other students to be discussing the 2004 Consent Agreement?[3]

A. Yes.

Q. That they wanted to get [appellee] and the cheerleading coach fired, correct?

A. Yes.

Q. And the teacher, fourth period Spanish, had to break them up and tell them to knock it off?

A. Yes.

Q. And two students continued their discussion, per your report Student Number 5 and Student Number 11, correct?

A. Yes.

Q. And who were the students that made their complaints about [appellee] during the very next period, fifth period?

…

A. Student 11 and Student 5.

Q. Same two students, right?

A. Well, Students 5, 12 and 16 made the presentation, Students 11 and 5 went in to [Principal] Brashear's office after that.

Q. Per your report, I'm about halfway in your paragraph, according to Student 8, and in fairness they weren't just discussing the 2004 agreement,

---

[3] As discussed in more detail below, before his employment with Rossford, appellee worked for a school district in Athens, Ohio. He left that employment following allegations of inappropriate conduct, and the 2004 Consent Agreement was the result of the Ohio Department of Education's investigation into those allegations.

7.

they were also discussing their frustration with [appellee] following the slide show presentation per your report, correct?
A. Yes.
Q. Okay. And per your report it says on page seven according to Ms. Sofo, the Spanish teacher?
A. Yes.
Q. And students in the class, the girls expressed frustration with [appellee] following the slide show presentation, is that accurate?
A. Yes.
Q. And the conversation detoured, is that what that is?
A. Yes.
Q. Into a discussion of [appellee]'s disciplinary history at Athens City Schools and related media coverage, correct?
A. Yes.
Q. What related media coverage was there?
A. I do not recall specifically.
Q. Okay. And then Ms. Sofo recalled that Student 5 began the conversation and that Students 8, 9, 11, 17 and 18 were a part of that group, correct?
A. Yes.
Q. And according to Student 8 the girls said they were going to get [appellee] fired and also get rid of [the cheerleading advisor]?
            …
A. Correct.
Q. [The cheerleading advisor] had no history at Athens school?
A. No.
Q. So that was specific to the uniforms?
A. Yes.
Q. They were going to get her fired because they didn't like that they got denied their uniforms, correct?
                …
A. There were some other issues.
Q. With [the cheerleading advisor]?
A. Yes.
Q. And did they make a complaint about [the cheerleading advisor] as well?
A. It wasn't, it was more about like who got to stand in the front row versus the back row, just in general there was a few girls who just like with any high school sport, you know, aren't happy with the amount of playing time or their position in the pyramid, you know.
Q. Did they make complaints about [the cheerleading advisor]?
A. No.

Q. And then you go on to say Ms. Sofo put an end to the girls' conversation. Student 11 went over to Student 5's desk to speak to her, correct?
A. Yes.
Q. And so that's the two complainants that after it's broken up or the teacher breaks up the conversation amongst the one, two, three, four, five, six, seven girls, right?
A. Yes.
Q. Student 11 and Student 5 continue to talk and then the very next period they went to the principal and made their complaints about [appellee's] misconduct, correct?
A. Correct.
Q. And all of that information is redacted from the publicly released investigation report, correct?
        …
A. Yes.
Q. Within an hour of the denial of the presentation they are making complaints about [appellee], correct?
A. Yes.

{¶ 11} Finally, appellee was interviewed with his counsel present on February 26, 2019, a week after his interview had been originally scheduled due to a request from appellee's attorney, and Spangler documented appellee's responses in her report. Appellee was not told the names of the students who had made the complaints, and no one from Rossford had given him any information regarding the specific nature of the misconduct allegations before the interview despite an earlier request for more information from appellee. However, during the interview, appellee admitted that an acquaintance of his—who was also the mother of a high school student—had called him in advance to tell him that a student told Spangler that appellee had touched her hair. The student, who Spangler designated as Student 3, was not one of the complainants but had been in the second group interviewed by Spangler.

9.

{¶ 12} When questioned, appellee denied ever touching a female student on her face or hair except on one occasion. Appellee said that on that occasion he pushed Student 3's hair out of her eye. Appellee asserted that otherwise he had only touched a student by giving a "side hug" or a "high five," or by tapping a student's shoulder to get the student's attention.

{¶ 13} During her investigation, Spangler also reviewed appellee's prior employment at Athens. When Rossford hired appellee in spring 2004, appellee was working as the athletic administrator for Athens City Schools (Athens). In 2003, the Athens superintendent reprimanded appellee after an athletic trainer complained that appellee had been inappropriate and sexually harassing. The Athens superintendent suggested that appellee seek a fresh start elsewhere.

{¶ 14} Accordingly, appellee began searching for a new job, and he interviewed with Rossford in spring 2004. Appellee did not inform Rossford about the reprimand against him during his interview. The board hired appellee in April 2004, and appellee's employment with Rossford began on August 1, 2004.

{¶ 15} Sometime after appellee's interview with Rossford, appellee learned that the Ohio Department of Education (ODE) had opened an investigation into his conduct at Athens due to a complaint from an Athens parent or community member. On September 14, 2004, appellee and the ODE entered into a consent agreement. The consent agreement stated that appellee had engaged in "inappropriate touching [of] the hair, face and/or lower back of various members of the school community." Under the consent

10.

agreement, appellee had to comply with several requirements to maintain his teaching license. In addition, the Rossford superintendent had to submit regular reports to the ODE regarding appellee's compliance. Sometime after he was hired, but before entering into the consent agreement, appellee discussed the ODE investigation with the Rossford superintendent (appellant was not yet the Rossford superintendent).

{¶ 16} Based on her investigation, Spangler found the complainants' allegations consistent and credible despite their likely retaliatory motive. Spangler noted that other students, including those in the group suggested by appellee and who generally supported him, as well as staff members who had no motive to lie had either experienced or observed appellee engaging in same type of conduct as in the complaints. Accordingly, Spangler also found that appellee's near categorical denial of the allegations was not credible. Further, Spangler noted appellee's single admission of potentially inappropriate conduct also happened to be the exact conduct his friend had warned him about.

{¶ 17} Spangler concluded that although appellee's conduct had been inappropriate, his conduct did not rise to the level of sexual harassment as defined by the board's policy. Spangler found that appellee's actions had not been sufficiently severe, persistent or pervasive to interfere with the complainants' educational performance or to create a hostile educational environment. In so finding, Spangler considered the timing of the complainants' allegations in connection with appellee's denial of the cheerleaders' request for new uniforms.

11.

**{¶ 18}** Finally, Spangler recommended that, at minimum, appellee should be disciplined for his conduct. Spangler further recommended that appellee undergo extensive professional development and training as well as counseling and that he be closely supervised in the future.

### 2. The Transition Agreement

**{¶ 19}** On April 12, 2019, two days after Spangler delivered her report to appellant, appellee signed a transition agreement. The transition agreement, the terms of which appellee negotiated with the assistance of his attorney, provided for his separation from his employment. Appellee did not see Spangler's report before signing the transition agreement. Following a vote, the board executed the transition agreement on April 22, 2019.

**{¶ 20}** The transition agreement contained the following provisions relevant to this appeal: (1) the agreement served as written notice that appellee would be "ceasing all employment" with the board effective July 31, 2019, when his employment contract expired; (2) the board had not then concluded nor would the board conclude that appellee had "engaged in any conduct giving rise to assignment, reassignment, discipline, non-renewal, and/or termination of [appellant's] employment with the board"; (3) the board had not then concluded nor would the board conclude that appellee had "committed an offense under R.C. 3319.31, R.C. 3319.39, and/or any applicable laws"; (4) the board had not then "initiated any assignment, reassignment, discipline, termination, and/or non-renewal proceedings with respect to [appellant] nor [would] the board'; (5) appellee was

12.

reassigned to working from home until the end of his contract on July 31, 2019; (6) no "records of a disciplinary nature issued by the board" were in "any personnel file, personal information system, or other file or information kept by the board or any board employee/official regarding [appellee]."

### 3. The ODE Report

{¶ 21} On April 22, 2019, the same day the board approved the transition agreement, appellant submitted a report regarding appellee to the ODE on an ODE form entitled School District, DD Board & Community School Educator Misconduct Reporting Form ("ODE form"). On the ODE form, appellant checked boxes next to the following two options as reasons for making the report: (1) "The employee resigned because of, or in the course of, an investigation regarding an act unbecoming the teaching profession or an offense described in Ohio Revied Code 3319.31 or 3319.39"; and (2) "[t]he employee has engaged or may have engaged in conduct unbecoming to the teaching profession." Appellant wrote that students had made complaints of misconduct in February 2019, and after the district investigated the complaints, the district "concluded that while [appellee] did not engage in sexual harassment as defined in the policy, he did engage in inappropriate conduct, including unwanted touching of students' hair and/or shoulders. [Appellee] generally denied any wrong-doing and resigned prior to any disciplinary proceedings being initiated."

### 4. Release of Information regarding the Investigation to the Public

13.

{¶ 22} Many members of the community became aware that appellee was the subject of an investigation soon after the complaints were made. In mid-February 2019, two local newspaper articles regarding the investigation were published. The first article reported on appellee's discipline in Athens, the details of which the newspaper obtained from Athens through a public records request. The article stated that a Rossford spokesperson had declined to provide specifics about the investigation, and a board member stated that the investigation was "being kept under wraps." Similarly, the second article reported that Rossford had not provided any information about the allegations or the investigation. Rossford received several public records requests during the investigation into appellee, but Rossford did not provide any information in response to the requests until after the investigation concluded.

{¶ 23} On April 22, 2019, the same day that the board approved the transition agreement and appellant submitted the ODE form, appellant also responded to the public records requests. Appellant released the completed ODE form as well as a redacted version of Spangler's report. Identifying details regarding the students, such as any references to the complainants as cheerleaders, were redacted throughout Spangler's report. The entirety of the two paragraphs detailing the timing of the complaints in relation to the cheerleaders' request for new uniforms was also redacted.

{¶ 24} A month later, on May 22, 2019, appellant issued a letter (community letter) addressed to the Rossford Schools community in response to community concerns about the appellee's prior discipline in Athens, the complaints, and Rossford's response

14.

to the complaints. At the outset of the community letter, appellant explained that Rossford could share only limited information about the investigation with the public due to FERPA and to prevent the complainants from being revictimized through media reports.

{¶ 25} Appellant then addressed appellee's history in Athens, asserting that appellee did not tell Rossford about the complaints or discipline in Athens at the time of appellee's hire and the ODE did not discipline appellee until after appellee had already started working for Rossford. Appellant emphasized that an entirely new board had been elected since 2004 and different people were serving as superintendent and high school principal at that time.

{¶ 26} The letter stated that the district "conclude[d] that while [appellee] did not engage in sexual harassment as defined in policy, he did engage in inappropriate conduct, including unwanted touching of students' hair and/or shoulders." Appellant further stated that the board accepted appellee's resignation rather than pursuing termination to avoid lengthy termination procedures and so that the students would not have to testify. Appellant characterized the investigation findings as "disturbing" and appellee's actions as "completely unacceptable," and stated appellee "violated the trust of our students, community, his fellow employees and [appellant]." Finally, appellant explained he and Rossford had intended to provide transparency to the community by previously releasing Spangler's report and the ODE form.

**B. Procedural History**

15.

{¶ 27} On April 21, 2021, appellee filed a complaint against appellant and Rossford asserting several causes of action stemming from appellee's separation from his employment with Rossford. In addition to a breach of contract claim and several constitutional claims, appellee included four tort claims: defamation, false light, intentional infliction of emotional distress, and negligence.

{¶ 28} In support of his defamation claim, appellee alleged that appellant and Rossford made false representations and statements to the public that appellee had engaged in misconduct during his employment and that appellant acted with malice and recklessness. In support of his negligence claim, appellee alleged that appellant and Rossford had breached several duties they owed him, including a duty to perform an accurate and fair investigation, a duty to provide him with information about the allegations against him in advance of his interview, a duty to give him a hearing, and a duty to accurately publish information about the investigation findings.

{¶ 29} In their answer, among other things, appellant and Rossford asserted several affirmative defenses, including appellant's immunity under R.C. Ch. 2744.

{¶ 30} The parties filed cross motions for summary judgment. In support of their motion, Rossford and appellant argued in part that appellant was entitled to immunity from liability. Appellant asserted that he was acting within the scope of his employment as a political subdivision employee. Appellant alleged that all of his statements were accurate statements regarding the investigation, its findings, and appellee's separation

16.

from employment. Accordingly, appellant alleged that appellee could not establish recklessness or malice to overcome appellant's immunity.

{¶ 31} In response, appellee conceded that appellant was acting within the scope of his employment, but argued appellant was not entitled to immunity because appellant was civilly liable to appellee for his violation of Ohio law. Appellee claimed that in publishing Spangler's report and the ODE report, appellant violated Ohio laws that require the confidentiality of investigations into educator misconduct. Further, appellee argued the information regarding the complainants' likely retaliatory motive made their complaints less credible, and therefore redacting that information from Spangler's report misrepresented the credibility of their complaints to the public.[4] In addition, appellee claimed that a jury could conclude appellant acted recklessly or with malice because appellant did not give appellee a copy of Spangler's report, tell appellee the names of the complainants or the specific nature of the alleged misconduct, or give appellee an opportunity to respond after appellant released Spangler's report and the ODE report to the public and issued his letter to the community.

In reply, appellant argued that he was not civilly liable because the law cited by appellee applied to investigations conducted by the ODE, not investigations conducted by school districts. Further, appellant claimed he was required by Ohio public records laws

---

[4] In support of this argument, appellee cited the unredacted version of the report and moved to file the unredacted version of Spangler's report—the one she delivered to appellant—under seal. The trial court's docket does not reflect that the trial court ruled on the motion.

17.

to release Spangler's report and the ODE report, and federal law required Rossford to redact personally identifying information about students, which included information identifying the complainants as cheerleaders. Indeed, Rossford asserted that they relied on the advice of counsel in determining which information to redact, which evidences a lack of recklessness or malice. Finally, appellant asserted that when appellee elected to separate from his employment pursuant to the transition agreement, he relinquished any rights he had to notice or a hearing. Appellant pointed out that after the transition agreement was in effect, appellee was free to contact the media or appear at a public board meeting to present more information about the credibility of the complaints.

{¶ 32} The trial court denied appellee's motion for summary judgment. The court granted in part and denied in part the motion for summary judgment filed by appellant and Rossford, holding that genuine issues of material fact remained on all of appellee's claims except for his claim for intentional infliction of emotional distress, which the court dismissed. As to appellant's political subdivision employee immunity, the court agreed with appellee's argument that a reasonable juror could conclude that appellant acted recklessly or with wantonness or malice. The court reasoned that summary judgment was premature because genuine issues of material fact remained regarding whether Rossford breached the transition agreement. Therefore, explained the court, the trier of fact must first determine whether the breach of contract occurred before the court could determine whether appellant was entitled to immunity. The court did not discuss whether the civil liability exception to political subdivision employee immunity applied.

18.

### III. Assignment of Error

**{¶ 33}** Appellant timely appealed and assert the following error for our review:

> The trial court erred by failing to accord immunity to Appellant School Board's employees and Appellant Creps pursuant to R.C. 2744.02 and R.C. 2744.03 with respect to Appellee's tort claims.

### IV. Law and Analysis

**{¶ 34}** In his sole assignment of error, appellant argues that the trial court erred in not granting his motion for summary judgment seeking dismissal of appellee's tort claims against him based on appellant's immunity as a political subdivision employee.

**{¶ 35}** We review the grant or denial of a motion for summary judgment de novo, applying the same standard as the trial court. *Lorain Natl. Bank v. Saratoga Apts.*, 61 Ohio App.3d 127, 129 (9th Dist.1989); *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105 (1996). Under Civ.R. 56(C), summary judgment is appropriate where (1) no genuine issue as to any material fact exists; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion, and viewing the evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the nonmoving party. *Harless v. Willis Day Warehousing Co.*, 54 Ohio St.2d 64, 66 (1978).

**{¶ 36}** A "material fact" is one which would affect the outcome of the proceeding under the applicable substantive law. *Russell v. Interim Personnel, Inc.*, 135 Ohio App.3d 301, 304 (6th Dist.1999); *Needham v. Provident Bank*, 110 Ohio App.3d 817, 826 (8th Dist.1996), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, (1986).

19.

Additionally, "[w]hether a political subdivision or its employee may invoke statutory immunity under R.C. Chapter 2744 generally presents a question of law." *Hoffman v. Gallia Cty. Sheriff's Office*, 2017-Ohio-9192, ¶ 38 (4th Dist.).

{¶ 37} On a motion for summary judgment, the moving party has the burden of demonstrating that no genuine issue of material fact exists. *Dresher v. Burt*, 75 Ohio St.3d 280, 292 (1996). In doing so, the moving party must point to some evidence in the record in the form of "pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action[.]" Civ.R. 56(C); *Dresher* at 292-293. The burden then shifts to the nonmoving party to provide evidence showing that a genuine issue of material fact does exist. *Dresher* at 293. The failure to satisfy this reciprocal burden warrants judgment against the nonmoving party. *Id.*

{¶ 38} Here, the trial court held that genuine issues of material fact remained as to whether the exception to political subdivision employee immunity in R.C. 2744.03(A)(6)(b) applied to appellant in this case. R.C. Ch. 2744 provides immunity from liability to employees of political subdivisions—including employees of a public school board—unless one of the following three exceptions apply:

(a) The employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities;

(b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner;

20.

(c) Civil liability is expressly imposed upon the employee by a section of the Revised Code * * *.

R.C. 2744.03(A)(6).

{¶ 39} Once a political subdivision employee establishes that immunity applies, the burden shifts to the party seeking to impose liability to establish that one of the exceptions applies. *Jones v. Lucas Cty. Sheriff's Med. Dept.*, 2012-Ohio-1398, ¶ 9 (6th Dist.).

{¶ 40} The parties do not dispute that appellant, as an employee of the board, is an employee of a political subdivision, and as such, he is entitled to immunity unless one of the three exceptions apply, nor do the parties dispute that appellant was acting within the scope of his employment and therefore R.C. 2744.03(A)(6)(a) does not apply. At issue in this appeal is whether a genuine issue of material fact remains on either of the other two exceptions in R.C. 2744.03(A)(6).

### A. Malicious Purpose, in Bad Faith, or in a Wanton or Reckless Manner

{¶ 41} The exception in R.C. 2744.03(A)(6)(b) to political subdivision immunity—which requires the plaintiff to prove that the employee acted with malicious purpose, in bad faith, or in a wanton or reckless manner—presents a high bar. *Fabrey v. McDonald Village Police Dept*, 70 Ohio St.3d 351, 356 (1994). The Ohio Supreme Court recently defined the different types of conduct in R.C. 2744.03(A)(6)(b) as follows:

> We have explained that the terms "'willful,' 'wanton,' and 'reckless,' [as used in R.C. 2744.03(A)(6),] describe different and distinct degrees of care and are not interchangeable." *Anderson v. Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711, 983 N.E.2d 266, ¶ 31. We defined reckless conduct as "conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially

21.

> greater than negligent conduct." *Id*. at ¶ 34; *see also O'Toole*, 118 Ohio St.3d 374, 2008-Ohio-2574, 889 N.E.2d 505, at ¶ 73 (referring to recklessness as a "perverse disregard of a known risk"). Wanton misconduct is "the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result." *Id*. at ¶ 33.

*Smathers v. Glass*, 2022-Ohio-4595, ¶ 33. Of the types of conduct in R.C. 2744.03(A)(6)(b), recklessness may require the lowest showing from a plaintiff, but the bar for establishing recklessness is still high. *O'Toole v. Denihan*, 2008-Ohio-2574, ¶ 75. Summary judgment is appropriate in cases in which a plaintiff alleges the employee acted recklessly "where the individual's conduct does not demonstrate a disposition to perversity." *Id.*, citing *Fabrey* at 356.

{¶ 42} Indeed, this court has affirmed summary judgment in favor of an employee of a political subdivision based on immunity in other cases. In *Simon v. Mitchell*, 2017-Ohio-671 (6th Dist.), the plaintiff filed a complaint asserting malicious prosecution and related torts against a police chief, in part because the police chief and plaintiff had a history of personal disagreements. This court affirmed the trial court's order granting summary judgment because the plaintiff could not establish an exception to political subdivision employee immunity, and the "charges at issue in [the plaintiff's] complaint were investigated and were filed after consultation with the prosecuting attorney." *Id*. at ¶ 22.

{¶ 43} The Ninth District addressed political subdivision immunity in the context of a defamation claim in *Nice v. Akron*, 2023-Ohio-2230 (9th Dist.). In that case, a former police chief decided to resign after someone alleged the chief used racist language

22.

to describe his direct supervisor, engaged in title fraud, and committed sexual misconduct toward a female subordinate. *Id*. at ¶ 2. The mayor held a press conference the next day regarding the chief's resignation and the allegations against him. *Id*. Because the mayor did not investigate the allegations and there were reasons to doubt their credibility, the plaintiff asserted the mayor had acted maliciously or with ill will. *Id*. at ¶ 20. The appellate court affirmed the trial court's order granting summary judgment in favor of the mayor, explaining that the chief had admitted to using a racist word and resigned rather than refute the allegations against him, and therefore the mayor was entitled to immunity. *Id*. at ¶ 25.

{¶ 44} In contrast, cases in which we have held that summary judgment was inappropriate regarding immunity have involved significant evidence of tortious conduct or evidence of a defendant's ill intent. *See, e.g., Stachura v. Toledo*, 2013-Ohio-2365 (6th Dist.) (holding that summary judgment dismissing employment-discrimination claims against city firefighters on the basis of immunity was inappropriate because the plaintiff's case involved "extensive claims and vast evidence" spanning "a multi-year timeframe"); *Spitulski v. Bd. of Education of Toledo City School Dist.*, 2017-Ohio-2692 (6th Dist.) (affirming trial court's order denying supervisor's motion for summary judgment in an age-discrimination claim where the supervisor asked questions about when the plaintiff was going to retire and stated that the district wanted to discharge him because he had too much gray hair).

23.

**{¶ 45}** Here, the trial court's order denying summary judgment reasoned that because genuine issues of material fact remained regarding whether the transition agreement was breached, fact issues remained regarding whether appellant's conduct fell under the exception to immunity in R.C. 2744.03(A)(6)(b). Appellee alleges that R.C. 2744.03(A)(6)(b) applies to defeat appellant's immunity because appellant acted with a malicious purpose, in bad faith, or in a wanton or a reckless manner in many ways in connection with appellee's separation from his employment. Appellee's allegations against appellant can be grouped into the following categories: the investigation, the release of allegedly confidential information regarding the investigation, the release of allegedly inaccurate or misleading information, and the redaction of the cheerleaders' motive.[5]

### 1. The Investigation Procedures

**{¶ 46}** In the first category, appellee claims that appellant's handling of the investigation was so far outside of Rossford's policies for such investigations as to make appellant's actions reckless. Appellee argues that Rossford was obligated to provide appellee with more specific information concerning the allegations against him in a timelier manner, and Spangler was required to get signed written statements from the

---

[5] Appellee also argues that he was subjected to disparate treatment –he claims the school did not treat allegations that a cheerleading adviser "fat-shamed" a student in the same way as the allegations against him—which he contends is further evidence of a malicious purpose, bad faith, or wantonness or recklessness. However, because appellee failed to raise this argument before the trial court, we cannot consider it on appeal. *See Lester v. Don's Automotive Group, LLC*, 2021-Ohio-4397, ¶ 49.

24.

complainants. Appellee also argues that Spangler should have reviewed CCTV video surveillance footage in the building. Even if true, however, these assertions do not create a genuine issue of material fact that appellant acted with recklessness, wantonness, malice, or bad faith.

{¶ 47} Almost immediately after learning of the complaints, appellant contacted Spangler, the district's anti-harassment compliance officer, to begin an investigation. Spangler interviewed twelve students and several staff members, including those suggested by appellee, and she conducted a lengthy interview of appellee himself before drafting a detailed report, all with the assistance of legal counsel. Appellee was notified in writing that he had been accused of misconduct regarding a student soon after he was placed on leave. At his interview, appellee was represented by counsel (it was rescheduled so appellee's attorney could attend).

{¶ 48} Notably, this investigation did not involve an educator who may not have been fully aware of investigation procedures—as the district's only other anti-harassment compliance officer, appellee was expected to be aware of the school's policies regarding investigations. Nonetheless, appellee executed the transition agreement waiving claims involving his separation from employment. Accordingly, appellant's conduct with respect to the investigation did not involve a "perverse disregard of a known risk." *O'Toole*, 2008-Ohio-2574, at ¶ 73. Further, whether Rossford breached the transition agreement does not relate to whether appellant properly followed the investigation procedures.

25.

**2. Appellant's Characterization of Appellee's Conduct, Separation, and Rossford's Prior Knowledge of Appellee's Conduct in Athens**

{¶ 49} Appellee alleges that appellant released inaccurate or misleading information about him, thus demonstrating recklessness at minimum. Appellee claims appellant's statements on the ODE form and in the community letter that appellee resigned were inaccurate because appellee worked for Rossford for the remainder of his employment contract. Appellee also claims that appellant's characterization of appellee's conduct as inappropriate was inaccurate and appellant's assertion that the district concluded appellee engaged in inappropriate acts conflicts with the transition agreement, which provided that the district would not so conclude. Additionally, appellee alleges that the community letter's assertion that Rossford was unaware of appellee's prior discipline in Athens when appellee was hired must be false because the Rossford superintendent was required to make regular reports to the ODE as part of appellee's consent agreement.

{¶ 50} However, appellee has not set forth sufficient evidence to create a genuine issue that appellant's characterization of appellee's conduct, his separation from employment in the ODE report or his community letter, or Rossford's prior knowledge of appellee's discipline in Athens was done recklessly, or with wantonness, malice, or bad faith.

{¶ 51} First, regarding appellee's prior discipline in Athens, the community letter stated that Rossford was not aware of appellee's discipline in Athens or the ODE investigation at the time that appellee was hired. Appellee conceded that he himself did

26.

not know of the ODE investigation regarding Athens nor did he share any information regarding his discipline in Athens at the time of his interview. Appellee argues now that Rossford was aware of his prior discipline and the consent agreement when he was hired by Rossford in 2004. However, appellee has not submitted any evidence to support that that argument. On the contrary, when appellee was questioned at his deposition about the accuracy of the community letter assertion regarding Rossford's lack of knowledge of the Athens discipline and consent agreement upon appellee's hire, appellee testified as follows:

> Q. Yes. When you were hired by Rossford you did not mention your discipline from this conduct?
> A. No, I did not.
> Q. Nor did the mention the prior conduct in Athens, correct?
> A. I did not mention that. I did not mention that, but the Ohio Department of Education in receipt because of our, no disclaim received because of when he was hired by our district, no discipline, the Ohio Department of Education did not discipline Mr. Murtha for actions in September. So, I just want -- yes.
> Q. So that's correct?
> A. Yes, that's correct.

{¶ 52} Indeed, Rossford hired appellee in April 2004, and appellee did not enter into the consent agreement with the ODE until September 2004, so it would have been impossible for him to inform Rossford about the consent agreement at the time of his hire. According to appellee's own testimony, that conversation occurred sometime after his hire. As such, appellant's statement that Rossford was unaware of appellee's history in Athens at the time of appellee's hire was supported by appellee's own deposition testimony and cannot establish recklessness.

27.

**{¶ 53}** Next, in the ODE report, appellant stated that the district concluded that appellee's conduct was "inappropriate" but not "sexual harassment as defined in policy." In the community letter, appellant made a similar statement. Appellant's characterization of appellee's conduct was nearly a direct quote of Spangler's conclusion from her investigation report, which she reached after interviewing several witnesses, including appellee, and consulting with legal counsel. Indeed, in the investigation, students without any apparent motive to retaliate against appellee reported the exact same type of inappropriate conduct as the complainants, and staff members who worked near appellee also reported witnessing appellee's inappropriate conduct with other students. Further, as a public employee, appellee had the opportunity to have a hearing to further refute the allegations against him, and he elected to waive that process by entering into the transition agreement.

**{¶ 54}** Just like the defendant's statements in *Simon v. Mitchell*, 2017-Ohio-671, appellant's statements were made only after an investigation into the allegations. And just like the plaintiff in *Nice v. Akron*, 2023-Ohio-2230, appellee chose to cease his employment rather than to refute the allegations against him. Appellant's characterization of appellee's conduct as "inappropriate" merely reflects the conclusion of a thorough investigation and therefore does not rise to recklessness or malicious under R.C. 2744.03(A)(6)(b).

**{¶ 55}** Similarly, appellant's characterization of appellee's separation from his employment as a "resignation" cannot be construed as reckless. Appellee did remain

28.

employed with Rossford following the transition agreement. He did not, however, return to most of his duties after the transition agreement, and he agreed his contract would not be renewed when it expired a few months later. Notably, under Ohio law, most educators employed under a contract with a school board are entitled to a presumption that their contract will be renewed, and if either the educator or the school board does not plan to renew the contract at its expiration, the nonrenewing party must give advance notice. *See* R.C. 3319.11. Accordingly, even if appellee's argument is true and appellant's characterization of appellee's separation from employment as a "resignation" was not entirely precise—and we express no opinion on whether it was or not—appellant's statements cannot be construed as meeting the high bar of R.C. 2744.03(A)(6)(b).

{¶ 56} Further, although appellee argues that appellee's statements constituted a breach of the transition agreement—an issue that is not before us and on which we expressly decline to opine—that is a separate issue from whether appellant acted recklessly or with malice in repeating the investigation's conclusion that appellee acted inappropriately publicly or describing his separation as a resignation. The parties' arguments about the timing of the conclusion (i.e., was the conclusion reached before or after the transition agreement was executed) and who made the conclusion (i.e., did Spangler's conclusion amount to a conclusion of Rossford) go to the issue of whether the termination agreement was breached. There is no dispute that appellant's statements accurately described the conclusion of an investigation conducted by a Rossford employee at Rossford's behest. Accordingly, appellant has set forth sufficient evidence

that appellee failed to rebut that appellant's statements were not made with recklessness, malice, wantonness, or bad faith for purposes of R.C. 2744.03(A)(6)(b), especially in consideration of appellant's duty to make some of those statements as discussed below.

### 3. The Redaction of the Complainants' Retaliatory Motive in Spangler's Report

{¶ 57} Appellee also argues that by releasing a version of Spangler's report in which the two paragraphs discussing the complainants' likely retaliatory motive was redacted, appellant withheld from the public all potentially exculpatory information regarding appellee.[6]  Appellant contends that state and federal law requires schools to redact personally identifiable information about students, students without a similar motive made similar allegations against appellee, and appellee was free to publicly discuss the motives of the complainants.

{¶ 58} Contrary to appellee's argument, not all potentially exculpatory information was redacted from the publicly released version of Spangler's report.  The publicly released version of the report included statements from staff members and students who did not witness appellee acting inappropriately toward the complainants as well as appellee's own denials of the accusations.  The only exculpatory information that was redacted was the information that identified the complainants as cheerleaders.

{¶ 59} R.C. 3319.321(B) and 20 U.S.C. 1232g(b) prohibit a public school district from releasing a student's personally identifiable information.  Under federal law, a

---

[6] The unredacted report was not a part of our record.  However, the parties do not dispute the substance of the redactions, and as previously discussed, Spangler's deposition testimony includes a lengthy discussion of the redacted sections.

30.

student's personally identifiable information includes "information that would make the student's identity easily traceable." *Baker v. Mitchell-Waters*, 2005-Ohio-1572, ¶ 25, quoting *Ellis v. Cleveland Mun. School Dist.*, 309 F.Supp.2d 1019, 1022 (N.D.Ohio 2004). Because schools are subject to public-records requests, schools must redact personally identifiable information from documents otherwise subject to public record requests. *See, e.g., State ex rel. ESPN v. Ohio State Univ.*, 2012-Ohio-2690, ¶ 33 (holding that a university was required to provide access to records containing personally identifiable information concerning student-athletes after first redacting that information).

{¶ 60} As discussed below, appellee has not presented a meritorious argument to refute appellants' contention that the district was legally obligated to release Spangler's report in response to public-records requests. The release of the report containing identifying the complainants as cheerleaders at REVS could have made their identities easily traceable.

{¶ 61} Appellant's compliance with state and federal laws cannot be the basis for a claim that he acted recklessly or with wantonness, bad faith, or malice. Further, the inclusion of other exculpatory evidence in the publicly released version of the report supports appellant's explanation that the redactions were intended to protect student identities and not to make the complaints against appellee appear more credible to the public. Therefore, appellee has not met his burden to establish that appellant's release of a redacted version of Spangler's report met the high bar required to overcome appellant's immunity under R.C. 2744.03(A)(6)(b).

31.

### 4. Appellant's Release of Spangler's Report, the ODE Form, and the Community Letter

{¶ 62} Next, appellee argues that all records relating to complaints of an educator's misconduct are confidential under Ohio law, and therefore appellant's actions in releasing Spangler's report and the ODE form, and discussing the investigation in his community letter, defeat appellant's immunity under R.C. 2744.03(A)(6)(b). However, appellee's argument fails as a matter of law.

{¶ 63} First, appellant had an obligation to submit the ODE report under R.C. 3319.313(B), which requires a district to report to the ODE whenever an educator "has resigned because of or in the course of an investigation by the board of education, governing board, or chief administrator … regarding whether the employee has committed an act that is unbecoming to the teaching profession." R.C. 3319.313(B)(4). This obligation is so important that the Ohio legislature expressly protected reporters from liability for making the reports. R.C. 3319.313(G).

{¶ 64} Next, the confidentiality laws cited by appellee do not apply to local school districts. R.C. 3319.311(A)(1) provides as follows:

> *The state board of education, or the superintendent of public instruction on behalf of the board*, may investigate any information received about a person that reasonably appears to be a basis for action… Except as provided in division (A)(2) of this section, all information received … and all information obtained during an investigation is confidential and is not a public record under section 149.43 of the Revised Code.

(emphasis added).[7]

---

[7] Division (A)(2) of that section relates to situations in which an educator is convicted by a court of an offense and therefore does not apply to this case.

32.

{¶ 65} The first phrase of the statute provides that "the state board of education, or the superintendent of public instruction on behalf of the board, may investigate," making the state board of education or the superintendent of public instructions the investigator, not a local school district.

{¶ 66} In contrast, R.C. 3319.314 applies specifically to investigation reports prepared by local school districts. The statute requires school districts to keep investigation reports in the employee's personnel file. R.C. 3319.314. The statute further provides if the ODE performs an investigation and determines no action is required, the statute requires the district to move the investigation report from the employee's personnel file to a "separate public file." *Id.* Accordingly, the statute contemplates the public release of investigation reports even after the ODE performs an investigation.

{¶ 67} Appellee further argues that Adm.Code 3301-73-04 makes the investigation records confidential and not subject to public records requests. Adm.Code 3301-73-04(A) provides that "[a]ll information obtained during an investigation is confidential and is not a public record." Further, "[i]nformation received by the department, pursuant to an investigation is confidential and not subject to discovery in any civil action." Adm.Code 3301-73-04(F). However, this entire chapter of the administrative code governs proceedings conducted by the state, not local districts.

{¶ 68} Appellee has not pointed to any authority applying the confidentiality provisions of either Adm.Code 3301-73-04(A) or R.C. 3319.311(A)(1) to local school districts, nor any other authority requiring a school district to keep investigation records

33.

confidential. Further, R.C. 3319.314's requirement that district investigation reports for teachers be kept in personnel files, which are generally subject to public disclosure, and reports on those who are investigated by the ODE but not disciplined are expressly subject to public disclosure creates the opposite implication—school districts' investigation reports are subject to public disclosure.

{¶ 69} Here, Spangler's report was not created in response to an ODE investigation. The investigation was conducted entirely within the district by a district employee, and the report was completed before the ODE was contacted. Further, appellant only released Spangler's report after the investigation had concluded—no one from Rossford spoke to the press while the investigation was underway—and only in response to public records requests under Ohio public records law to which Rossford was subject as a political subdivision. *See* R.C. 149.011(A) and (G); R.C. 149.43(A). Further, appellant has presented evidence of rising public interest and community concern about the investigation conclusions. Appellant's release of the reports and discussion of the investigation's conclusions in his community letter in response to the concern "does not demonstrate a disposition to perversity" as required by R.C. 2744.03(A)(6)(b). *O'Toole*, 2008-Ohio-2574 at ¶ 75, quoting *Fabrey* at 356.

34.

### B. Civil Liability

{¶ 70} Appellee claims that appellant is liable for releasing the investigation report and the Educator Misconduct Reporting Form to the media. R.C. 1347.10 creates civil liability for disclosing personal information in a manner prohibited by law. If the investigation report and statements in the Educator Misconduct Reporting Form were confidential, as appellee contends, then their release would be a prohibited disclosure of personal information.

{¶ 71} Appellant argues that even if the reports were confidential, their release falls under an exemption in R.C. 1347.04. R.C. 1347.04(A)(1)(e) exempts "[p]ersonal information systems that are comprised of investigatory material compiled for law enforcement purposes by agencies that are not described in divisions (A)(1)(a) and (d) of this section."

{¶ 72} The trial court's order denying summary judgment does not address whether the civil liability exception under R.C. 2744.03(A)(6)(c) applies. Accordingly, this issue is not ripe for our review, and we remand this case to the trial court for further proceedings addressing this issue. *See Accent Group, Inc. v. Village of N. Randall*, 2004-Ohio-1455, ¶ 15 (8th Dist.).

## V. Conclusion

{¶ 73} The trial court erred in holding that genuine issues of material fact remain on whether the exception to political subdivision employee immunity in R.C. 2744.03(A)(6)(b) applies to appellee's claims against appellant. Further, because the

35.

parties briefed and argued whether the exception to political subdivision employee immunity in R.C. 2744.03(A)(6)(c) applies, the trial court erred in not addressing the issue. Accordingly, we find appellant's assignment of error well-taken and we reverse the April 20, 2023 judgment of the Wood County Court of Common Pleas and remand the case for consideration of whether R.C. 2744.03(A)(6)(c) applies to appellee's claims against appellant.

{¶ 74} Appellee is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment reversed,
and remanded.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.                    _____
                                                           JUDGE
Christine E. Mayle, J.

Gene A. Zmuda, J.                        _____
CONCUR.                                                JUDGE

                                                _____
                                                           JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions. Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.